Filed 2/5/14  P. v. Russell CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHERNOBY RUSSELL et al.,<br><br>    Defendants and Appellants. | B243631<br><br>(Los Angeles County<br>Super. Ct. No. BA371243) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Drew E. Edwards, Judge.  Affirmed.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant Chernoby Russell.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant James Evans, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Chernoby Russell and James Evans, Jr. (Russell and Evans individually, and defendants collectively) appeal from judgments entered after they were convicted of gang related murder and attempted murder. They contend that the trial court erred in the following respects: admitting telephone records and photographs stored on cell phones; failing to instruct the jury sua sponte with CALCRIM No. 1403; refusing to bifurcate trial of the gang allegation; and curtailing cross-examination regarding third-party culpability. Defendants also contend that the gang finding was not supported by substantial evidence, and that Penal Code section 12022.53[1] violates their constitutional right to equal protection. In addition, Evans contends that his identity as a participant in the crimes was not supported by substantial evidence, and that the trial court erroneously admitted unauthenticated text messages and evidence of a rifle found in the trunk of the car used in the crimes.

Both defendants contend that their convictions must be reversed due to cumulative error and that the errors resulted in constitutional violations; and each defendant joins in any applicable arguments made by the other. Defendants assert for the first time on appeal as to every claim raised here that the error or misconduct had the additional consequence of violating constitutional rights, such as the right to confrontation, due process, or a fair trial. As we find no merit to any of defendants' underlying assignments of error, we affirm the judgments without addressing the additional constitutional issues.[2]

## BACKGROUND

### Procedural history

Defendants were charged in count 1 of a two-count information with the murder of Kendall Williams (Williams), in violation of section 187, subdivision (a), and in count 2, with the willful, deliberate, and premeditated attempted murder of Marcus Barnes (Barnes), in violation of sections 664 and 187, subdivision (a). The information specially

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

[2]    See *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17; *People v. Partida* (2005) 37 Cal.4th 428, 433-439.

alleged that a principal personally and intentionally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), (d) and (e), which caused great bodily injury and death to Williams and Barnes within the meaning of section 12022.53, subdivision (e)(1). The information further alleged that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

Defendants were tried together.[3] The jury found defendants guilty as charged, found the murder to be in the first degree, and found the attempted murder to be willful, deliberate, and premeditated. In addition, the jury found true the firearm and gang allegations. On August 24, 2012, the trial court sentenced each defendant to a total of 75 years to life in prison, computed as follows: 25 years to life as to count 1, the base term, plus 25 years to life pursuant to section 12022.53, subdivision (d); and a life term as to count 2, plus 25 years to life pursuant to section 12022.53, subdivision (d). Each defendant was given credit for 834 days of actual presentence custody.

Defendants filed timely notices of appeal.

**Prosecution evidence**

### *The shooting and flight from police*

On Saturday evening, March 27, 2010, a group of young people attended a party at the home of relatives near 68th Street and Vermont Avenue. At about 10:00 p.m., several of them were walking back from the corner store while others waited, watching from the front yard of the relatives' apartment building. Among those walking were Barnes, his brothers, Traveon and Tyler Griffith, his cousins Mychal Lee (Lee), Deanna Graves, and Depaul Graves, and some friends, including Williams.[4] A black sedan moved slowly past, made a U-turn, pulled alongside them, and one or more of the passengers opened

---

[3] The information named a third defendant, Deanthony Joe Miller (Miller), but he was dismissed from the case prior to trial.

[4] To avoid confusion, we henceforth refer to Traveon and Tyler Griffith by their first names, and to Deanna and Depaul Graves by their first names.

fire on the group, killing Williams and striking Barnes in his hip and lower leg. Barnes later underwent two surgeries and remained in the hospital for a week. At the time of trial he was still in pain, undergoing frequent treatment, and still walking with a limp.

Barnes and Deanna testified at trial that they heard gunfire and saw a muzzle flash emanating from the passenger side window of the black sedan. Barnes identified a photograph of the car and pointed it out in a surveillance video of the shooting. Lee also identified the shooters' car in court from a surveillance video, adding that the passenger window was down. He then saw the shooter stick a large caliber gun out the window and heard more than five gunshots. Lee lived in the neighborhood where the shooting occurred and knew it to be a Crip gang area.[5] Tyler saw the black car approach with the back passenger window all the way down, saw a passenger fire a chrome revolver which he thought was a .44-caliber, and heard about four to six gunshots. Tyler described the shooter as a dark-skinned male African-American in his 20's, wearing braids, a white shirt and no hat. Depaul also saw a bright flash coming from the car and heard three shots, followed by at least 10 more.

Traveon testified he saw the car approach the group, and then saw an occupant of the car roll down the window and start shooting. Traveon heard 6 to 10 gunshots in all, and saw a muzzle flash from the passenger side. Traveon could not describe the car, and gave conflicting testimony regarding the identity of the shooter and the gun. He denied making some of the statements he gave to detectives, claiming that he merely passed on information given to him by his brother Tyler; but admitted that he saw the shooter's eyes as his face was visible from the top lip upward. Traveon testified that although he did not live in the area, he often visited the neighborhood around 68th Street and Vermont Avenue, and knew it to be the territory claimed by the 65 Menlo Crip gang. It became known in the neighborhood that the shooting was gang related. Traveon denied being

---

[5] Barnes, Traveon Tyler, Lee, Depaul and Deanna all denied ever having been associated with a gang, and testified that no one in the group had ever associated with a gang.

afraid to testify, but admitted that he knew what a "snitch" was, and in gang culture snitches were murdered.  He did not want to be a snitch.

Officers Anthony Daniel and Scott Coffey of the Los Angeles Police Department (LAPD), were on patrol that evening in the area of South Vermont Avenue and 68th Street, when they heard the gunfire.  When they looked in the direction of the sound they saw a muzzle flash coming from the passenger compartment of a black four-door Nissan Maxima (Nissan), which then moved away westbound.  The officers followed the Nissan, broadcast their location, and requested backup.  At 66th Street and Kansas Avenue, the Nissan abruptly stopped and three African-American men got out and fled on foot.  The officers described one of the suspects as wearing dark clothing and another as wearing a white shirt and tan pants.  The third man to exit the car was in dark clothing and wore his hair in cornrow braids.  The suspects left the car doors open when they fled, and Officer Daniel found a glove on the street next to an open car door.

LAPD Officer Matthew Fryer also heard the gunfire while on patrol.  He testified that the gunshots sounded like they came from a large caliber handgun such as a .44- or .45-caliber.  He and his partner followed Officers Coffey and Daniels and joined the foot chase after the Nissan stopped.  Officer Fryer also described the third person to flee the Nissan as an African-American man with his hair in cornrows.

The officers lost sight of the suspects when they turned onto 65th Place from Kansas Avenue.  A perimeter was set up as other police officers and a K9 unit joined the search.  The suspects were not found within the perimeter, but clothing and a gun were found along the route of the foot pursuit.  Two light-colored shirts were recovered, as well as a black jacket resembling the jacket worn by the suspect with cornrows.[6]

### *The crime scene investigation and recovery of additional evidence*

Investigating officer, LAPD Detective David Dilkes, testified that he went to the location where the Nissan was abandoned and saw that the front and rear passenger

---

[6]     Several officers later identified former codefendant Miller as one of the occupants of the Nissan.

5

windows were down and the key was still in the ignition. He found the registration, in the name of Aisha Hill (Hill), later determined to be related to Russell. In a carport on 66th Street, in the area of the suspects' escape route, Detective Dilkes recovered a .44-caliber chrome handgun loaded with three live rounds. Other officers found black clothing containing a set of keys and a knit cap (a "do-rag") in the pocket of the black jacket.

The Nissan was impounded and then searched, swabbed for DNA, and adhesive fingerprint lifts were taken. Three cell phones were found in the center console, while a pair of black knit gloves and a stainless steel .357-caliber revolver were found on the floorboard of the front passenger seat containing six empty casings. A blue bandana was found on the passenger side next to a white cell phone. In the trunk, officers found a loaded rifle and a black knit glove similar to the other gloves recovered. In the passenger compartment of the car, officers found a CD case, two disposable cameras, a pair of gold glasses, and two backpacks, one with $55 cash, a paper bearing Russell's name, and a paper addressed to Arshae Henderson (Arshae). A photograph of Russell wearing gold glasses was later extracted from one of the cell phones. The keys found in the ignition were specific to that particular car and had not been "shaved." Detective Dilkes explained that car thieves would often shave a key to make it fit into the ignition of the same model car.

### DNA and fingerprint analysis

LAPD DNA analyst Sherille Lynn Cruz (Cruz) testified that she processed epithelial cells collected from defendants, Miller, and Williams, and swabs or cuttings taken from the items in evidence, before feeding them into a machine to obtain a repeating pattern of numbers called alleles. Cruz explained that a DNA profile consists of a pair of alleles in 15 locations on a DNA strand. One number in the pair is inherited from the contributor's father and the other from the mother. A DNA "match" occurs when the same alleles in a single-source profile are in the same position as the sample profile. A single-source profile can be compiled for the major contributor of DNA to items having more than one contributor. Without a major profile from a DNA mixture, a

6

comparison to the number and locations of alleles can still produce what is considered a possible match.

In the course of her analysis of the items in evidence, Cruz found a match to Russell's DNA profile on two gloves and the white shirt. Among the items with several contributors, Evans was a possible match to the DNA mixture profiles obtained from other gloves, the bandana, a brown shirt, and a .357-caliber handgun. Russell was a possible match to the DNA mixture profiles obtained from the steering wheel, the plaid shirt, the .357-caliber handgun, and the .44-caliber handgun. The DNA on the gearshift showed one identical allele at every location in Russell's DNA, but the major contributor was female. The analysis of the remaining items in evidence either excluded Russell and Evans or was inconclusive.

Forensic print specialist Celine Dove compared the fingerprints in evidence to those taken from Evans, and determined that the print lifted from the outside door frame of the back passenger door belonged to him.

### *The cell phones*

Detective Dilkes testified that he executed search warrants for subscriber information and activity for the three cell phones recovered from the Nissan. The white cell phone (item No. 7), was registered to Hill, the owner of the Nissan; the purple cell phone (item No. 9), was registered to Russell; and the black cell phone (item No. 11), was registered to Evans. Only the purple cell phone was active on the day of the shooting as service to the two others had been discontinued earlier in March due to nonpayment. Russell's phone records showed more than 50 text messages to Arshae's phone number on March 27, 2010. Evans's phone records showed many previous texts to Arshae.

Arshae testified that Detective Dilkes and his partner interviewed her in April 2010 about the text messages, which had been exchanged between 9:00 a.m. and 9:00 p.m. on March 27, 2010. After initial denials, she admitted that she was acquainted with defendants and had texted Evans about going to the beach that day. After the prosecutor played a recording of her interview, Arshae admitted she knew Russell as "Bashin," a member of the 11-Deuce Broadway Crip gang, and that she knew that Evans

7

was using Bashin's cell phone that day to exchange texts with her. Arshae thought Evans was called "Tiny Zag" after his older brother, who was known as "Zigzag."

Detective Brian Calicchia testified about his examination of the purple and the black cell phones. He turned them on and found user names for the phones were "Tiny Zag 112" and "B.G. Finest." Detective Brian Collins, who specialized in extracting and analyzing information from electronic memory devices, extracted emails, call logs, and contact lists, as well as the photographs stored on memory cards in the purple and black cell phones.

### *The search of Evans's home*

Detective Dilkes testified that that after Arshae identified a photograph of Russell, he obtained a search warrant for Evans's address. Both Evans and Russell were there at the time the warrant was executed. Officers recovered Evans's social security card, a holster later determined to fit the recovered .44-caliber revolver, a speed reloader for a .44-caliber revolver, .44-caliber and other ammunition, a photograph of Evans at a shooting range, a firearm safety pamphlet, and other items.

### *Defendants' gang membership, activities, and tattoos*

LAPD Gang Enforcement Officer Warner Carias testified that between 2008 and 2011 he was assigned to monitor three gangs in his area, including the 11-Deuce Broadway Gangster Crip gang.[7] During the evening of November 2, 2008, Officer Carias was assigned to observe the Broadway Gangster Crip gang's "Hood Day" party, which took place in the gang's territory on 109th Place, just west of Main Street.[8] The

---

[7] Throughout the trial, witnesses called the gang by its full name, the 11-Deuce Broadway Gangster Crip gang, or abbreviated the gang's name in various ways, such as the 112th Broadway Gangster Crips, the 112 Broadway Gangster Crip gang, or simply the Broadway Gangsters. We will refer to it as the Broadway Gangster Crip gang and to its members collectively as the Broadway Gangster Crips.

[8] Officer Carias explained that a Hood Day is a gang's day of celebration, and the date chosen usually reflected the name of the neighborhood or the gang. Thus, 11-Deuce, which refers to 112th Street, used November 2.

majority of attendees, more than 15, were members of the Broadway Gangster Crip gang or its subsets, including the 5-Deuce Broadway Gangster set.[9] There were no children or older people present.

Defendants attended the party that day together and with a third person, Lamont Sessions (Sessions). Officer Carias took photographs of all of the attendees, gathered as much information about them as he could, and documented the information. Evans was "dressed down" in the gang's color, wearing a blue shirt and blue pants. Russell was also wearing blue: a blue T-shirt; a blue bandanna; and a blue baseball cap with the letter "B" for Broadway Gangsters on it. Both of the defendants and Sessions, each admitted to being a member of the 5-Deuce Broadway Gangster set. Sessions told Officer Carias that his moniker was "Way Out." Neither Russell nor Evans indicated a moniker.

LAPD Officer Eduardo Mercado also came into contact with Russell the night of the 2008 Hood Party, not far from 109th Place and Main Street. Russell admitted to being a member of the Broadway Gangster Crip gang and gave his moniker as Bashin. He was in the company of M. Bruce and D. Russell, both members of the Broadway Gangster Crip gang. Officer Mercado documented the contact on a field identification card (F.I. card).

In March 2009, LAPD Officer Collin Brennan stopped a car driven by Evans in the company of Sessions, and documented their conversation on an F.I. card. Evans provided his driver's license number, admitted he was a gang member, and said his moniker was "Lil Tiny."

Detective Dilkes took photographs of the tattoos on Evans and Russell, and during trial showed them to the jury, and explained their gang significance. Evans had a tattoo of a bird with money bags, a common representation of the "Get Money Squad" of the Broadway Gangster Crip gang. On Russell's neck was "11-Deuce"; and on Russell's

---

**9**       We henceforth refer to the 5-Deuce Broadway Gangster subset as the Broadway Gangster Crip gang or Broadway Gangster Crips, except where necessary to distinguish it from the entire 11-deuce Broadway Gangster Crip gang.

right inner forearm was "B" with wings, surrounded by "11-Deuce W.S." and "5-Deuce W.T."

### *Gang expert*

LAPD Detective Patrick Flaherty testified as the prosecution's gang expert noting that the gangs within his area of expertise included the Broadway Gangster Crip gang, the Main Street Mafia Crip gang, and several others. Detective Flaherty testified that as of March 2010, the Broadway Gangster Crips sometimes called themselves "Ways" or "Broadways." The term "A's, Ways, and Mains" referred to three aligned gangs which normally got along with one another: the Avalon Gangster Crip gang, the Broadway Gangster Crip gang, and the Main Street Mafia Crip gang.

Detective Flaherty explained that the Broadway Gangster Crip gang had approximately 130 to 140 members, and would "throw" a common hand sign to identify themselves. The 5-Deuce Broadway Gangster Crip gang subset was part of the same gang as the 11-Deuce Broadway Gangster Crip gang, with members claiming allegiance to both. The gang and its subset both claimed territory that included 112th Street. The Broadway Gangster Crip gang's special color was blue, and members often wore blue clothing, as well as hats with a "B" on them, such as Brooklyn Dodger hats. Members usually wore their special color at Hood Day celebrations. Sometimes gang members celebrated Hood Day by going into rival territory with other members to commit shootings.

Detective Flaherty described tattoos commonly worn by Broadway Gangster Crip members: "B.G.C."; "112"; "G.M." which represented the "Get Money Squad"; and "W" for Way or Watts. Tattoos indicated dedication to the gang and could mean that a member had put in work for the gang. Detective Flaherty explained that "putting in work" meant committing crimes to benefit the gang, such as dealing drugs or guns, and committing shootings or robberies. Gang members must "earn the ink" by putting in work for the gang, and a nonmember who had not put in work would not normally wear a gang related tattoo, as that would place him in danger from the gang.

10

The gang's preferred graffiti was "11-Deuce B.G.C." or simply "Broadways." The Broadway Gangster Crips considered the East Coast Crip gang to be their enemy, and disrespectfully called its members "Cheese Toast" because it sounded like East Coast. To demonstrate their disrespect, Broadway Gangster Crips would create graffiti of two X's within a square, representing dead toast.

Detective Flaherty testified that the primary activities of the Broadway Gangster Crips were tagging on walls (writing graffiti), vandalizing, dealing in narcotics, primarily cocaine and marijuana, unlawful firearm possession, shootings, robberies, including street robberies and armed robberies, drive-by shootings, and murder. He presented certified conviction records of other Broadway Gangster Crip gang members. One was for Akeeda Joshua (Joshua), who was convicted of possession for sale of cocaine base and assault with a firearm on a peace officer, committed in August 2009 while a member of the Broadway Gangster Crip gang. Detective Flaherty was acquainted with Joshua, who had admitted being a member of the gang. Another record was for Jamar Louie Henry (Henry), who was convicted of assault with a firearm on a police officer committed in November 2006. Henry admitted that his crime was gang related. Detective Flaherty knew Henry and knew that he was a member of the Broadway Gangster Crip gang at the time of the offense.

Detective Flaherty was also acquainted with Deondre Stone (Stone), another Broadway Gangster Crip gang member, who he knew to be a high-ranking "top level guy" in the gang: a "shot caller" who would give orders to the younger members to put in work for the gang.

The photographs extracted from the cell phones registered to Russell and Evans were shown to the jury. Detective Flaherty explained the gang images seen in some of them.[10] Photographs from Evans's cell phone included images of a street sign reading, "Watch for Broadwayz" with a reference to 5-Deuce and 11-Deuce, Cheese Toast with

---

[10] Photographs from Russell's purple phone, item No. 9, were admitted as exhibits 84 and 85. Photographs from Evans's black phone, item No. 11, were admitted as exhibits 86, 87, 88, and 89.

11

the eyes crossed out, and an unhappy face. Other photographs included one depicting the words "Highly Active Crip Zone"; another with a T-shirt reading "Zigzag" and "B.G.C."; and one with the image of Evans forming a gang sign with his fingers, a "2" for Deuce. Photographs from Russell's cell phone included: images of dollar bills lined up to form "112"; the Bentley automobile emblem -- a "B" with wings, possibly a reference to Broadways; a T-shirt depicting a cheese toast with squinting eyes and an unhappy face; and a belt with the letters "B.G.C."

Detective Flaherty testified that gang members would accompany one another on a "mission" to provide witnesses who could report back that the perpetrators had put in work for the gang by committing crimes. He explained that a mission was criminal activity required by the gang, anything from a drive-by shooting to a robbery. Detective Flaherty also explained the concept of respect in gang culture. Gang members believed that they earned the community's respect by gaining a reputation for violent retribution, and that such respect would cause witnesses to refrain from cooperating with the police, thus allowing the gang to operate in the neighborhood and commit their crimes with impunity. The more brazen and vicious the crime, the greater the respect and status earned by the perpetrator within the gang.

Any person who cooperated with the police would be labeled a "snitch" and dealt with by violence. A snitching gang member would be ousted or killed, while other snitches could receive death threats or have their homes subjected to drive-by shootings until they stopped cooperating.

Gang members normally did not enter rival gang territory unprepared for a possible assault. For a mission, preparation would mean carrying weapons, whereas a party or business meeting would require a disguise or covering tattoos. Detective Flaherty was familiar with the area of West 68th Street and South Vermont Avenue, which was near the territory claimed by the 67 Neighborhoods gang, a rival of the Broadway Gangster Crip gang. Members of the Broadway Gangster Crip gang would normally arm themselves before going into the territory of the 67 Neighborhoods gang, which was aligned with the East Coast Crip gang.

12

Detective Flaherty was able to assume the following hypothetical facts and then give his opinion: Broadway Gangster Crip gang members enter the area near West 68th Street and South Vermont Avenue in a car; in the car, they have two loaded revolvers, two pairs of gloves, a bandana, and a semiautomatic rifle in the trunk; they pass a group of young people, make a U-turn, come around, pull up to the group, and without saying anything, start shooting at them. Detective Flaherty opined that the shooting was gang related as the gang members went into a rival gang's neighborhood prepared to shoot someone, which would qualify as putting in work for their gang. Regardless of whether the victims were gang members, such a shooting would benefit the Broadway Gangster Crip gang by spreading fear and intimidation through the community, thus enhancing its reputation and providing the respect necessary to allow the gang to control the community and operate with impunity.

Detective Flaherty testified that gang members were proud of their gangs and willingly admit their gang affiliations to the police for that reason. Investigations showed that during drive-by shootings, the shooters would sometimes call out their gang's name in order to take responsibility and to demonstrate pride in the gang. However, in Officer Flaherty's last four or five investigations of gang related shootings, he found that there was no calling out of gang names, apparently in an effort to distract law enforcement. Even without giving the name, such a shooting would still benefit the gang as the participating gang members would report to their gang, describe what happened and brag about it in order to gain respect and standing within their gang. The community would then learn who was responsible by word of mouth, and respect for the gang would thus be enhanced.

Detective Flaherty concluded that the hypothetical shooting was committed for the benefit of, at the direction of, or in association with a criminal street gang. The benefit gained was the fear and intimidation of the community, preventing witnesses and victims from coming forward and allowing the gang to operate freely; the association element consisted of gang members coming together to commit a crime to benefit the gang.

13

**Defense evidence**

Kenya Blackmon testified about a conversation with Detective Dilkes in April 2010, about an acquaintance she knew as "Green Eyes" and with whom she exchanged text messages the month before. When Detective Dilkes showed her a photograph of Russell, she denied that he was "Green Eyes" and claimed that "Green Eyes" was named Deanthony, and was not one of the defendants.

LAPD Officer Chris Giargiari was the prosecution's gang expert at the preliminary hearing, where he testified that Miller was a member of the Main Street Crip gang, a separate gang from the Broadway Gangster Crip gang. Officer Giargiari was not familiar with Miller before this case and testified that he was a member of the Main Street Crip gang based on an F.I. card prepared by another officer. Officer Giargiari had heard of the 65 Menlo gang, and testified at the preliminary hearing that he thought the 65 Menlo gang was not a rival of the Broadway Gangster Crip gang, but at trial he acknowledged that he did not know that and had never been assigned to investigate the 65 Menlo gang. Officer Giargiari also testified that the area of 947 West 68th street was within Menlo territory, which borders on the territory of the Broadway Gangster Crip gang. The territory of the Broadway Gangster Crip gang shared a border with the Main Street Gangster Crip gang, and the two gangs were friendly most of the time.

Russell's mother, Hill, testified that she and Russell both attended I.C.D.C College and usually went there together in her black Nissan Maxima, which she reported stolen on March 27, 2010. She identified Evans as her nephew who was also enrolled at I.C.D.C. Hill claimed they rode together to school in the Nissan every day, and that she, Russell, and Evans had all gone to school together on Friday, March 26, 2010. Later, Hill testified that Evans was in the car almost every weekend.

Russell lived with Hill intermittently and she saw him only when they went to school. Hill denied that Russell ever drove the Nissan, and claimed she had only two keys for the car, one that she used and one that she kept in a safe. Hill said she did not have an electronic key and that the alarm system on the Nissan had been deactivated

14

because it drained the battery when the alarm sounded. She told the police that she did not recognize the key recovered in the investigation.

Hill also testified that she parked the Nissan on "La Fayette" between 6:00 p.m. and 7:00 p.m. on March 26, out of view from her apartment building on Beverly Boulevard. She last saw the car there between 11:00 a.m. and noon on March 27, when she went to retrieve her white cell phone, which she left in the Nissan because it was not charged. She also saw the purple cell phone in the Nissan and left it there too. Hill claimed the purple cell phone belonged to her daughter but was in Russell's name because she was only five or six years old at the time, and also because T-Mobile did not permit Hill to have more than four accounts. Hill identified the black cell phone recovered from the car as belonging to Evans, which she saw on the back seat when she parked the Nissan the evening of March 26, 2010.

Hill claimed she discovered the car missing later that night, between 10:15 and 10:20 p.m., and reported the theft to the police sometime after 10:30 p.m. Hill was unable to explain why an aerial photograph showed her car parked at the curb on Beverly Boulevard at 4:00 a.m. on March 27. Hill was also unable to explain why someone was texting on the purple cell phone after 7:00 p.m. March 26, as well as every hour of the day of March 27 until 7:00 p.m. Hill did not know that contact information for Sessions was in her white cell phone under "I'm so Way Out 5253." She explained she knew Sessions's mother and thought her telephone number was in Hill's contacts list. Although Arshae's name appeared in Hill's contacts, Hill testified that she did not know the girl. Two email addresses were listed for Russell: one as "BGFinest" and the other with the user name, "Bashin112." Hill testified she knew Stone, another contact in her cell phone, and acknowledged living with him at one time. Hill identified a photograph of Evans and Stone taken in her backyard at a July 4, 2010 family function. Hill's children called Stone "uncle."

**Prosecution rebuttal**

LAPD Officer Stephen Dolan, who was responsible for maintaining the License Plate Recognition System, explained that two cameras were mounted on police vehicles;

15

one which took photographs of license plates and another which took photographs of an entire vehicle. The license plate was then read by a computer which provided information such as whether the car had been reported stolen, as well as global positioning system (GPS) coordinates. The location, date, and time would then be stamped on the photograph. The system scanned the Nissan's license plate on March 26, 2010, at 4:26 p.m. near the intersection of the 105 and 110 freeways, and again on March 27, 2010, at 3:56 a.m., while it was parked at the curb on Beverly Boulevard between Benton Way and Occidental Boulevard.

LAPD Detective Sean Hansen, who was assigned to the Cellular Analysis Survey Team -- an FBI task force -- analyzed call records for the cell phones registered to Russell and Hill. He determined the location of T-Mobile cell towers that calls and texts went through and estimated the area in which the cell phone was located at such times. Among others, calls on Russell's cell phone went through a tower located at 1223 West 68th Street, near the scene of the shooting on March 27, 2010, at 11:01 a.m. and again at 4:21 p.m. At 7:30 p.m. on March 27, 2010, a call was made to Hill's cell phone using a cell tower located near Hill's former residence.

Detective Dilkes testified that during his interview of Blackmon on April 29, 2010, she selected a photograph of Miller from a photographic lineup and identified him as "Green Eyes," saying that she knew Miller from high school.

Detective Dilkes interviewed Hill on April 15, and again on April 27, 2010, ostensibly regarding the theft of her car. Hill repeatedly told him and his partner that the last time she saw her black Nissan was at noon on March 27, 2010, and never said it was between 11:00 a.m. and 12:00 p.m. Hill told the detectives she had gone out to her car the night of March 27, because she needed to pick up her grandmother from bingo when no one else had done so. Hill never showed Detective Dilkes two keys for the Nissan at the same time. When he showed her the key retrieved from the Nissan's ignition, Hill claimed she had never seen it before. Hill said she would give the defendants occasional rides and drove them to family functions, but did not tell Detective Dilkes that she drove

16

them to school, or that Evans had been in the Nissan on March 26, 2010.  She said that Evans had not been in the Nissan for one or two weeks prior to the theft.

Detective Dilkes testified that Evans had been issued a traffic citation on February 20, 2010, while he was a passenger in the Nissan.  He also testified that the photograph of Evans shown to Hill at trial had been developed from the disposable camera found in the Nissan during the investigation.

## DISCUSSION

### I.  Substantial evidence of Evans's identity

Evans contends that the evidence was insufficient to prove beyond a reasonable doubt that he was involved in the shooting or to establish his identity as one of the occupants of the Nissan at the time of the shooting.

"The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt.  [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)  When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)  We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "The same standard applies when the conviction rests primarily on circumstantial evidence.  [Citation.]" (*Ibid.*)  We do not reweigh the evidence or resolve conflicts in the evidence.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively

demonstrate error. [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) A defendant does not meet his burden to show that the evidence is insufficient "by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*Ibid*.) Nor does the defendant meet his burden by demonstrating that the evidence or some of it can be as reasonably reconciled with a finding of innocence as guilt. (*People v. Kraft*, *supra*, 23 Cal.4th at pp. 1053-1054.) His "focus [must be] on the whole record of evidence presented to the trier of fact, rather than on '"isolated bits of evidence."' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261, quoting *People v. Johnson*, *supra*, 26 Cal.3d at p. 577.) Evans's summary fails in all these respects.

For example, Evans contends that the evidence showed that the only person identified as fleeing from the Nissan was Miller, who was not a member of defendants' gang, and that his gang was not known to "clique up" to commit crimes with the Broadway Gangster Crip gang. Evans fails to reveal the following: that although several officers identified photographs of Miller as one of the occupants of the Nissan, his participation was not established; that the evidence that Miller's affiliation with the Main Street Crip gang consisted of Officer Giargiari's review of one F.I. card prepared by another officer in a different division; or that Officer Giargiari merely testified he did not recall any crimes committed jointly by defendants' gang and the Main Street Crips. Evans's claim that the evidence showed that gangs used stolen cars to commit shootings is merely inferred from Detective Flaherty's testimony that stolen cars are *sometimes* used. Evans also infers from inconclusive DNA evidence, and from scientific evidence that was not presented at trial, that his DNA found in the Nissan was equally consistent with evidence that Evans regularly rode in the car because he was the owner's nephew. Finally, Evans discounts the evidence of his owning guns, accessories, and the photograph of himself at a shooting range as showing only that he was interested in firearms.

Summarizing the evidence in the light most favorable to the judgment, drawing all reasonable inferences in support of the jury's findings, we find more than substantial

18

evidence to support a finding that both Evans and Russell were in the Nissan at the time of the shooting and were principals in the crimes.[11] As Evans concedes, the evidence established that the car used in the shooting was the black Nissan registered to Russell's mother. There were at least three African-American men in the Nissan at the time, as officers saw them flee. Mychal told officers that the shooter was a dark-skinned African-American, and Arshae testified that Evans was dark-skinned. Defendants were cousins and frequently associated with each other, as shown by the testimony of Russell's mother that she often gave them rides in her Nissan, as well as their affiliation with the same gang, their attendance together at the gang's Hood Day celebration, and their presence together during the search of Evans's home. Evidence showing that defendants were together during the day of the shooting included the numerous text messages that Evans and Arshae sent to each other using Russell's cell phone, and cell phone records which placed Russell's phone near the crime scene that morning. Later, Evans's fingerprint was found outside the door frame of the back passenger door.

Evidence connected both defendants to the weapons most likely used in the shooting and items in or near the Nissan. Officer Fryer heard the gunshots during the shooting, and testified that they sounded like they came from a .44- or .45-caliber handgun. A .44-caliber handgun was found in a carport located on the perpetrators' escape route, and in a later search of Evans's bedroom, officers found a holster which fit the .44-caliber handgun, as well as a speed reloader for .44-caliber ammunition. A DNA analyst determined that Evans was a possible match to the DNA mixture profiles obtained from gloves, the bandana, and the .357-caliber handgun found in the car. Russell's DNA profile matched the DNA profile found on the two gloves and the white

---

[11]     "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

shirt. And Russell was a possible match to the DNA mixture profiles obtained from the steering wheel, another shirt, the .357-caliber handgun, and the .44-caliber handgun.

Evidence of a gang motive also supported a reasonable inference that Evans and Russell committed the crimes together. First, Detective Flaherty testified that criminal street gangs generally require their members to commit crimes for the benefit of the gang, and the primary activities of the Broadway Gangster Crip gang included drive-by shootings and murder. Thus an active member of the Broadway Gangster Crip gang would be expected to put in work for the gang by committing a shooting in rival gang territory. The shooting occurred near the territory claimed by the 67 Neighborhoods gang, which was a rival of defendants' gang and aligned with the East Coast Crips, a gang loathed by Broadway Gangster Crips, who disrespectfully referred to them as "Cheese Toast." In addition, the following evidence showed that defendants were devoted members of the Broadway Gangster Crip gang and took pride in their gang: they admitted their affiliation with the gang to law enforcement officers; they had gang related tattoos, suggesting they had put in work for the gang; their cell phones contained gang related images, including the symbol for dead Cheese Toast; and both defendants celebrated their gang's Hood Day while "dressed down" in blue, their gang's color.

We conclude that Evans has not met his burden to show error, and further, we conclude from our review of the whole record of evidence that substantial evidence supports defendants' convictions.

## II. Substantial evidence of gang finding

Defendants contend that the jury's finding the crimes were gang related was not supported by substantial evidence.

Section 186.22, subdivision (b)(1), authorizes a sentencing enhancement for felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." A gang enhancement finding is reviewed under the same substantial evidence standard as any other conviction. (See *People v. Albillar* (2010) 51 Cal.4th 47, 59-60.) Thus, "we review the entire record in the light

20

most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.] (*Ibid*.)

The jury may reasonably infer the association element from the very fact that the defendant committed the charged crime with another gang member, and the jury may fairly infer from substantial evidence that the defendant committed the crime in association with a known gang member that he had the specific intent to promote, further, or assist criminal conduct by gang members. (*Albillar*, *supra*, 51 Cal.4th at pp. 61-62, 67-68.) We have already determined that substantial evidence supported a finding that defendants were gang members, known to each other to be gang members, and that they committed the crimes together, thus satisfying the two elements of the enhancement.

In addition, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1). [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at p. 63.) Detective Flaherty's expert testimony in this case sufficiently demonstrated the benefit the gang would derive from defendants' crimes. He testified that the Broadway Gangster Crip gang was a violent criminal street gang, and that its primary activities included unlawful firearms possession, shootings, including drive-by shootings, and murder. He supported his opinion with the certified records of conviction of two other members of the gang for assault with a firearm on a police officer. Detective Flaherty testified that gang members gained respect from their gang by committing crimes for the gang's benefit, and the more brazen and vicious the crime, the greater the respect and status

21

earned by the perpetrator. He testified that violent crime benefitted criminal street gangs by spreading fear and intimidation throughout the community, thereby allowing them to operate with impunity.

Defendants contend that Detective Flaherty's opinion that the crimes were gang related was not sufficiently supported by other evidence in the record. They rely on a line of cases to argue that a gang expert's opinion must be supported by additional evidence demonstrating that the crime was committed to benefit a gang. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 ["gang expert's testimony alone is insufficient to find an offense gang related"]; *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 [the gang "expert simply informed the jury of how he felt the case should be resolved"]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 219 [no percipient witness or direct evidence that crime was gang related]; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 ["expert simply informed the judge of her belief of the minor's intent"]; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647 [handgun possession improperly based on expert's opinion that gang members possessed guns in common], disapproved in part in *People v. Vang* (2011) 52 Cal.4th 1038, 1047 & fn. 3, 1048.)

The continuing vitality of the view represented by these cases is in question, as the California Supreme Court has more recently rejected similar arguments, concluding: "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang*, *supra*, 52 Cal.4th at p. 1048; *Albillar*, *supra*, 51 Cal.4th at p. 63.)

We conclude that substantial evidence established that defendants were gang members, known to each other to be gang members, who committed the crimes together, and the crimes were of the kind that benefitted the gang. Thus, defendants committed the crimes in association with a gang with the specific intent to assist in any criminal conduct by gang members. (See § 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at pp. 61, 67-68.)

## III. Admissibility of cell phone records

Defendants contend that the trial court erred in admitting T-Mobile records for the three cell phones after overruling objections on the grounds of hearsay and lack of foundation.

"A trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record. On appeal, we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion. [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011, fn. omitted.) A printout of telephone call data may be admitted as a business record exception to the hearsay rule. (*People v. Zavala* (2013) 216 Cal.App.4th 242, 244.) That exception is set forth in Evidence Code section 1271: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event, if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Detective Dilkes testified that the call records were supplied in response to a search warrant. T-Mobile authenticated the material as a business record with a written certificate from the custodian of records though the certificate was not submitted simultaneously with the records and was not attached to them. T-Mobile faxed the certificate directly to the trial court after the call records had been admitted into evidence. Prior to the trial court's receipt of the certificate, Evans objected to Detective Dilkes's testimony regarding the identity of the subscriber on the account of each of the three cell phones, on the grounds of hearsay and lack of foundation. After the custodian's certificate was filed, Evans's counsel conceded that the certificate adequately laid out all the elements required by the Evidence Code, but objected to its admission on the ground that there was a break in the chain of evidence because it had not been attached to the call records. Russell's counsel did not object to the testimony of Detective Dilkes, the

23

admission of the call records, or the admission of the certificate. Russell's counsel expressly informed the trial court that he had no objection to the admission of the certificate.

Russell now contends that the authentication was inadequate because the custodian did not give live testimony and the records were not delivered directly to the court under double seal as provided in Evidence Code section 1560, subdivision (c). Russell further contends that because neither procedure was followed in this case, all the T-Mobile records, in particular those relating to text messages to and from Arshae, should have been excluded as hearsay.

As respondent points out, Russell's failure to object to the T-Mobile records or the custodian's certification resulted in a forfeiture of his contentions. "[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.]" (*In re Seaton* (2004) 34 Cal.4th 193, 198.) To preserve a claim of inadequate foundation for review, a defendant must object on that ground and state the basis of the inadequacy. (*People v. Diaz* (1992) 3 Cal.4th 495, 527-528.)

Russell claims the objections made by Evans's counsel as his own, but he did not join in those objections. In general, the failure to join in the objection of a codefendant results in a forfeiture of the issue on appeal unless doing so would be futile. (*People v. Wilson* (2008) 44 Cal.4th 758, 792.) To argue that there was no forfeiture, Russell relies on the rule that failure to press for a ruling does not waive an issue raised by the trial court by interposing, in effect, its own objection. (See *People v. Collins* (2010) 49 Cal.4th 175, 226-227.) Here, the trial court neither raised a foundation issue nor failed to rule on Evans's objections.

Russell also relies on the rule that instructional error may be reviewed without objection if it affected the defendant's substantive rights. (§§ 1259, 1469; *People v. Harris* (1981) 28 Cal.3d 935, 956-957.) The admission of evidence without the required

24

foundation is not instructional error. The appellate court may review any question of law involved in the admission of evidence only when the defendant objected to the evidence, the trial court considered the objection, and the ruling affected the defendant's substantial rights. (§§ 1259, 1469; Evid. Code, § 353.) Further, an objection does not preserve an issue for review unless the specific ground for it was made clear to the court. (Evid. Code, § 353.) Even then, the appellate court's review is limited to the ground stated for the objection. (*People v. Kennedy* (2005) 36 Cal.4th 595, 612, overruled in part on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; Evid. Code, § 353.)

Thus, even assuming that Russell is entitled to appellate review based upon Evans's objections, we note that Evans did not object to the T-Mobile records on the ground that the custodian did not give live testimony, or that the records were not delivered directly to the court under double seal as provided in Evidence Code section 1560, subdivision (c). The only objection Evans made to the custodian's foundational certificate was that it was not attached, and thus there was a break in the chain of custody. However, neither Evans nor Russell pursues this issue on appeal.

In any event, defendants have not demonstrated any prejudice caused by the admission of Detective Dilkes's testimony regarding the ownership of the cell phones, and we may not reverse the judgment due to the erroneous admission of evidence unless the error resulted in a miscarriage of justice. (Evid. Code, § 353; Cal. Const., art. VI, § 13.) As respondent observes, the T-Mobile records were not the only evidence of the ownership of each cell phone. The cell phones were found in the car used for the shooting, and Hill identified the user and registered owner of each cell phone. Detective Calicchia testified that when he searched the contents of defendants' cell phones he found the user names, Tiny Zag 112 and B.G. Finest. Detective Collins testified that he extracted emails, call logs, contact lists, and photograph data directly from the two cell phones. Russell's email address in Hill's contact list included the user name, BGFinest, and Arshae also appeared in Hill's contact list. As other evidence established the ownership of the cell phones and contact with Arshae without reference to the T-Mobile records, Detective Dilkes's testimony did not result in a miscarriage of justice.

25

## IV. Photographs extracted from the cell phones

*Authentication*

Defendants contend that the trial court erred in admitting photographs from their cell phones over their objections on the ground they were not properly authenticated.

"Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) A "writing" includes a photograph. (Evid. Code, § 250.) A photograph may be authenticated with sufficient evidence to sustain a finding that it is what the proponent claims it to be, or by establishing "such facts by any other means provided by law." (Evid. Code, § 1400; see also § 1410.) "We review a trial court's ruling on the sufficiency of the foundational evidence under an abuse of discretion standard. [Citation.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 165.) The trial court's discretion in admitting or excluding evidence "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Images on Evans's cell phone included street signs reading, "Watch for Broadwayz" and "Highly Active Crip Zone," and a T-shirt reading "Zigzag" (the gang moniker of Evans's brother). Russell's cell phone also contained gang related images, as well a photograph depicting Russell wearing gold glasses similar to those recovered from the Nissan.[12]

Detective Collins testified outside the presence of the jury after defendants objected to the admission of the photographs. He had extracted and analyzed the photographs, and was able to determine that some had been downloaded from the internet or emailed, and others had been taken by the cameras within the cell phones. He explained that because the paths were distinguishable, and computer files had creation dates as well as the dates the files were accessed or modified, he would be able to tell if they had been modified. Detective Collins concluded that the photographs had not been

---

[12] Defense counsel informed the trial court that defendant did not object to the photograph of Russell in gold glasses.

modified, and were downloaded or taken at the times indicated in the cell phone memory. He noted however, that a user with exceptional skill could manipulate the storage device to modify the photographs, dates, and times, and he would not be able to discern the manipulation.

The court found adequate authentication, noting Detective Collins's opinion that the photographs had not been modified and that only a very sophisticated user might have been able to make modifications.

Defendants complain that the evidence failed to establish who took the pictures, where they were taken, or whether they were accurate representations of their subject matter. Contrary to the suggestion in such argument that a photograph must always be authenticated by a witness who was present when it was taken, an expert witness may provide the necessary authentication. (*People v. Bowley* (1963) 59 Cal.2d 855, 859, citing *People v. Doggett* (1948) 83 Cal.App.2d 405, 410 (*Doggett*).) Thus, when there is no witness who can authenticate a photograph from personal observation, expert testimony that "the picture was not a composite and had not been faked" will provide a sufficient foundation. (*People v. Beckley* (2010) 185 Cal.App.4th 509, 515; see also *People v. Bowley*, *supra*, at p. 862; *Doggett*, *supra*, at p. 410.) Further, the photograph may be shown to be genuine through circumstantial evidence. (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435 (*Valdez*).)

Quoting from *Doggett* and adding emphasis to the quote, Russell suggests that the expert testimony must establish "an entire absence of anything which might tend to raise the *slightest doubt* about the matter." (*Doggett, supra*, 83 Cal.App.2d at p. 410.) The *Doggett* court found that the expert testimony had that effect in that case, but did not enunciate a rule regarding the degree of proof required for authentication. Evidence of authenticity must be "sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence. [Citations.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 832-833; see Evid. Code, § 403, subd. (a)(3).) Thus, the prosecutor's burden was "*not* to establish validity or negate falsity in a categorical fashion, but rather to make a showing

on which the trier of fact reasonably could conclude the proffered writing is authentic." (*Valdez, supra*, 201 Cal.App.4th at p. 1437.)

Defendants note that because it is possible to change memory cards and manipulate the photographs on a cell phone, someone else could have manipulated the images or placed them on the phones. They conclude that merely establishing the date, time, and absence of alteration of the photographs provided an insufficient foundation. They stress that in *Doggett*, there was, in addition to the expert opinion that the photographs had not been faked, items in the images connecting the defendants with the photographs; and in *Valdez*, material on an internet web page was sufficiently connected to the defendant, because the website could be accessed only with a password. (See *Doggett, supra*, 83 Cal.App.2d at p. 410; *Valdez, supra*, 201 Cal.App.4th at p. 1436.)

The photographs in this case were not loose prints as in *Doggett*. (See *Doggett, supra*, 83 Cal.App.2d at pp. 407-408, 410 [boxes of photographs].) The photographs were not on an internet web page that could be accessed remotely, as described in *Valdez, supra*, 201 Cal.App.4th at page 1434. Here, the photographs were on the memory cards inside the cell phones themselves. As the defendants' ownership of the cell phones had already been established, they had been sufficiently connected to defendants. "'The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]' [Citation.]" (*Valdez, supra*, 201 Cal.App.4th at p. 1435.) Once sufficient evidence supports a finding of authenticity, the issue becomes a question of fact for the jury. (*McAllister v. George* (1977) 73 Cal.App.3d 258, 262.)

In addition, the adequacy of the authentication is measured by the purpose for which the writing is admitted. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 747.) Here, the prosecution's offer of proof was to show that defendants kept the images in the cell phones that belonged to them, and that the images could be identified as gang related. When, where, and how the images were originally created or whether they were modified before they were placed on the cell phones would not have affected that purpose. The required foundation was thus to show that the photographs in the cell phones' memories

28

correctly depicted the images as they appeared when taken by the phones' camera, inserted into the camera on a removable memory card, or downloaded from elsewhere. Measured by this purpose, Detective Collins's testimony sufficiently authenticated the photographs. The possibility that a very skilled user might have manipulated the data was an issue of weight, not admissibility, and became a question for the jury to resolve.[13] (See *Valdez, supra*, 201 Cal.App.4th at pp. 1435, 1437; *McAllister v. George, supra*,73 Cal.App.3d at p. 262.)

### *Evidence Code section 352*

Defendants contend that the photographs from the cell phones should have been excluded under Evidence Code section 352 (section 352), which permits the trial court to exclude "evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or misleading the jury."

Initially, we observe that Russell does not claim to have made an objection under section 352 and we have found none. To preserve a claim under section 352, a party must make a specific objection on that ground in the trial court. (Evid. Code, § 353, subd. (a); *People v. Jones* (2012) 54 Cal.4th 1, 61.) The objection made by counsel for Evans was merely that three of the photographs extracted from Evans's cell phone were irrelevant to the prosecutor's offer of proof.[14] However, as the trial court weighed the probative value against the probable prejudicial effect on its own initiative, we consider the trial court's discretion.

Defendants contend that the photographs were probative only of defendants' gang membership, and that they were prejudicial because gang membership was evidence of

---

[13]     Defendants had the opportunity to cross-examine Detective Collins later when he testified at length before the jury.

[14]     One of the three photographs was of the T-shirt with "Zigzag" on it, and counsel objected because that was not Evans's moniker. Another photograph showed Evans making a hand sign, but a gang officer had testified that he did not recognize the sign. The third photograph was a sign or drawing with a reference to "Cheese Toast" which counsel did not believe to have any relevance to this case.

29

bad character likely to provoke an emotional reaction in the jurors, inviting them, in effect, to convict defendants solely because they were gang members. In essence, defendants believe that the photographs should have been excluded as inadmissible character evidence; however, as they neither mentioned Evidence Code section 1101 nor objected to the photographs on such a ground, they did not preserve this contention for review. (*People v. Valdez* (2012) 55 Cal.4th 82, 130.)

Relevant evidence may be excluded only if its probative value is substantially outweighed by its potential to cause *undue* prejudice. (*People v. Valdez, supra*, 55 Cal.4th at p. 138.) Evidence is not prejudicial in this context simply because it is inconvenient or damaging to the defense. (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.) "'[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. . . . The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely* tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

The gang membership of both defendants was quite relevant to the gang enhancement, as defendants' commission of the crime together, knowing the other was a gang member, raised the reasonable inference that they committed the crimes in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. (See § 186.22, subd. (b)(1); *Albillar, supra*, 51 Cal.4th at p. 68.)

Contrary to defendants' contention that the photographs had little value to prove motive, the gang related photographs provided persuasive evidence of motive by establishing their active gang membership, their pride in their gang, and their hatred of rivals. As active gang members, defendants were expected to put in work for the gang, such as by committing a shooting in rival gang territory. The shooting occurred near the territory claimed by 67 Neighborhoods gang, which was a rival of defendants' gang and aligned with the East Coast Crip gang. Broadway Gangster Crip members hated members of the East Coast Crip gang, and disrespectfully referred to them as Cheese

Toast. The symbol for dead cheese toast and an unhappy face appeared in a photograph on each cell phone. The photographs demonstrated defendants' pride in the gang and their mutual hatred for rivals, suggesting that they committed the crimes to benefit their gang or because it was expected by the gang.

Gang evidence is not rendered inadmissible simply because it is inflammatory. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) The prosecution is entitled to present relevant gang evidence unless it is *unduly* inflammatory, and the trial court is given wide latitude in admitting such evidence. (*Ibid*.; see *People v. Heard* (2003) 31 Cal.4th 946, 977-978.) Gang evidence is unduly inflammatory when there is a substantial likelihood the jury will use it not to logically evaluate the point upon which it is relevant, but to reward or punish one side due to the jurors' emotional reaction. (*People v. Scott, supra*, 52 Cal.4th at p. 491.) Whether gang evidence is unduly inflammatory is a discretionary determination by the trial court, and its discretion will not be disturbed unless it was exercised in an "'"arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" [Citations.]" (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438, quoting *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 (*Rodrigues*).)

The photographs had references to 5-Deuce, 11-Deuce, B.G.C., a hand sign for deuce, dollar bills forming 112, and a B with wings. Several of the images on the cell phones were similar and no more inflammatory than defendants' tattoos: Evans had a tattoo of a bird with money bags; and Russell had tattoos including representations of 11-Deuce, a B with wings, and 5-Deuce. Russell did not object to the photographs of his tattoos, and after the prosecutor agreed not to claim that a blurry one was gang related, Evans did not object to the photographs of his tattoos, either. Under these circumstances, defendants' claim that a few additional similar images *uniquely* tended to evoke an emotional bias against them is "untenable." (*People v. Valdez, supra*, 55 Cal.4th at p. 134.) For the same reason, defendants cannot show that a few additional images resulted in a miscarriage of justice, nor can they show any reasonable probability that defendants would have had a better result if they had been excluded. We thus find no abuse of

31

discretion and no prejudice. (See *Rodrigues, supra*, 8 Cal.4th at pp. 1124-1125; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*.)

## V. Arshae's text messages

Evans contends that the trial court should have excluded Arshae's testimony regarding text messages she sent to Russell's cell phone number, because the prosecutor failed to authenticate the messages by establishing that Evans in fact was the recipient.

Defense counsel objected to Arshae's testimony regarding her exchange of text messages with Evans, on the ground that it would be irrelevant without proof she was in fact communicating with Evans, and not someone else. The prosecutor represented that she would not seek to introduce the messages themselves, that Arshae would testify that Evans identified himself to her during the exchange, and that the subject of the messages showed that they were related to an activity that Arshae was planning with him. The objection was overruled.

We review the trial court's ruling for an abuse of discretion. (*People v. Tafoya, supra*, 42 Cal.4th at p. 165.) The trial court's discretion in admitting or excluding evidence "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Rodriguez, supra*, 20 Cal.4th at pp. 9-10.)

It was not the prosecutor's burden to establish the identity of the recipient "in a categorical fashion" as Evans suggests. (*Valdez, supra*, 201 Cal.App.4th at p. 1437.) Arshae confirmed her police interview in which she said that the recipient of the messages identified himself as "James"; and she testified she knew Russell, knew it was his cell phone, had his number stored in her cell phone memory, and knew that she was communicating with Evans. They discussed a beach trip they had planned. Such evidence was "sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence. [Citation.]" (*People v. Marshall, supra*, 13 Cal.4th at pp. 832-833; see Evid. Code, § 403, subd. (a)(3).) We find no abuse of discretion.

32

## VI. Bifurcation of gang allegation

Defendants contend that the trial court erred in denying their motions to bifurcate the gang allegation from the underlying charged offenses. They contend that bifurcation was required because the evidence of their identity was so weak and the evidence of gang association had such minimal relevance to issues of guilt, that the jurors were likely to convict based on criminal affiliation alone.

Joint trial of issues of guilt and the gang enhancement is favored; thus the issues may be tried together even if the evidence necessary to prove a gang enhancement would be inadmissible in a trial limited to the charged offenses. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1044, 1050. Bifurcation is unwarranted unless the defendant meets his burden to clearly establish a substantial danger that the gang evidence will be unduly prejudicial, either because the gang evidence does not relate to the crime or the defendant, or it is "of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Id*. at p. 1049.) We review the trial court's denial of a motion to bifurcate for abuse of discretion, and our review is based upon the record before the court at the time of the ruling. (*People v. Mendoza* (2000) 24 Cal.4th 130, 160-161.)

Evidence of gang activity may be admissible not only to establish the elements of the gang enhancement, but also to establish identity and motive. (*People v. Hernandez, supra*, 33 Cal.4th at p. 1049.) In denying the motion, the trial court found the gang evidence inextricably intertwined with the murder evidence. The record of the preliminary hearing supports that finding. The evidence established that the shooters were in the Nissan which belonged to Russell's mother. Facts suggesting that defendants were together in the Nissan at the time of the shooting included Russell's relationship to the owner of the car and the presence of defendants' cell phones in the car, as well as defendants' close association with each other, shown by their membership in the same gang, their joint attendance at a Hood Day celebration, sharing a cell phone, and their mutual acquaintance with Arshae.

The same evidence, when considered with the evidence of gang membership and activity, was relevant to the issue of motive. Defendants' close association with each other, the gang signs and symbols in their cell phones, their gang related attire, celebration of Hood Day, and admitting gang membership to law enforcement, all suggested that defendants participated in gang activities together. Officer Giargiari testified that the Broadway Gangster Crip gang's primary activities included assault with a deadly weapon and firearms offenses, that members of criminal gangs were ordinarily expected to engage in such criminal activities to further the gang's reputation or status, and that gang shootings were usually committed by a team of members.[15] He explained that committing such crimes in a group tended to prove the members' loyalty and trustworthiness to the gang.

Defendants contend that the trial court's error can be demonstrated with a comparison to the facts of *People v. Albarran, supra*, 149 Cal.App.4th 214, in which the gang evidence was found to be more prejudicial than probative and thus inadmissible, as it established that the defendant was a gang member but failed to tie him or his gang to the shooting. (See *id*. at pp. 227-228.) That case is inapposite, as it did not involve a motion for bifurcation of the gang allegation, and the court did not consider the defendant's burden or the showing necessary for bifurcation. Moreover, the facts are not comparable to the facts of this case, where there was ample evidence of defendants' identity as participants in the shooting.

We conclude that the trial court reasonably found the evidence of the gang enhancement inextricably intertwined with the evidence of the shooting. Further, defendants have not established that the evidence was otherwise inadmissible or the joint trial resulted in gross unfairness. (See *People v. Rogers* (2006) 39 Cal.4th 826, 851.) We have already rejected defendants' contention that there was no evidence identifying them

---

[15]  It was Officer Giargiari's opinion that the shooting was gang related. He based his opinion in part because it occurred in neighboring gang territory, although it was territory claimed by the 65 Menlo Gangster Crip gang, which was not a rival of the Broadway Gangster Crip gang. He explained that the crime would nevertheless elevate the status of the shooters within their gang.

as the shooters. As defendants cite the same reason in support of their contention that the joint trial resulted in a guilty verdict based solely on their gang membership, we also reject any suggestion that the denial of the motion resulted in unfairness. At trial, the evidence again established Russell's relationship to the owner of the car used in the shooting, the presence of defendants' cell phones, and defendants' close association with each other. Further, as respondent notes, the addition of DNA evidence, fingerprint evidence, and the location of cell towers used by Russell's cell phone the day of the shooting, all combined to provide overwhelming evidence of identity and guilt. Defendants thus did not meet their burden to justify bifurcation and have not met their burden to show that the joint trial was unfair.

## VII. CALCRIM No. 1403

Defendants contend that the trial court erred in failing to instruct sua sponte with CALCRIM No. 1403, which limits the jury's consideration of gang evidence. Evans suggests that the court should have given the instruction, modified to read as follows: "'You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancement allegations. [¶] You may also consider this evidence when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that (he/she) has a disposition to commit crime.'"

Defendants acknowledge that the California Supreme Court has held that the trial court has no obligation to give an instruction limiting gang evidence without a request. (See *People v. Jones* (2003) 30 Cal.4th 1084, 1116; *People v. Hernandez, supra*, 33 Cal.4th at p. 1051.) They note, however, that the court recognized "a possible exception in 'an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' [Citation.]" (*People v. Hernandez, supra*, at pp. 1051-1052, quoting *People v. Collie* (1981) 30 Cal.3d 43, 64.) Defendants contend that this is such a

35

case because the gang evidence was inflammatory and prejudicial, with minimal relevance to identification. They also contend that much of it was unnecessary to prove the enhancement, as defendants' gang membership was proven with the testimony of officers who had contact with them in the field.

There is no merit to defendants' contention. As originally drafted, but omitted from the modification defendants suggest, CALCRIM No. 1403 permits consideration of evidence of gang activity to determine not only whether the defendant acted with the intent, purpose, and knowledge required to prove the gang related enhancement allegations, but also to determine whether the defendant acted with the intent, purpose, and knowledge required to prove the gang related *crimes* and whether defendant had a *motive* to commit the crimes charged. Also omitted from the suggested modification is the following language of CALCRIM No. 1403: "You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion."

As noted by respondent and discussed in the last section, the evidence of gang activity was relevant to identity and motive, and thus admissible to establish more than the elements of the gang enhancement. The instruction suggested by defendants would have precluded the jury from considering gang related evidence relevant to defendants' motive, identity, and close association with each other. Proof of no more than defendants' gang membership would not have established both elements of the gang enhancement without evidence that they committed the crimes together. (See § 186.22, subd. (b)(1); *Albillar, supra*, 51 Cal.4th at p. 68.) We thus conclude that this is not an extraordinary case and the trial court had no obligation to give the instruction. (See *People v. Hernandez, supra*, 33 Cal.4th at p. 1052.)

## VIII. "Happy Jack"

Defendants contend that the trial court erroneously curtailed Russell's cross-examination of Traveon by sustaining the prosecution's hearsay objection to the following question: "The name that you gave to the officers that was involved in the

36

shooting, is that Happy Jack?" They also contend that the error resulted in a violation of their constitutional rights to confrontation, a fair trial, and to present a defense.

Defendants claim here, as they did below, that the prosecutor "opened the door" to the question by asking Traveon in direct examination whether he had told the detectives that there was talk in the neighborhood about the shooting and that people had been saying it was a gang shooting. Defendants contend that the Happy Jack question was necessary to test Traveon's credibility and to expose his unreliability as a witness. They compare the issue with impeachment cases holding that when the defendant takes the stand, the prosecutor may contradict or refute his testimony with evidence that would otherwise be inadmissible due to the privilege against self-incrimination. (See, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 72; *People v. Robinson* (1997) 53 Cal.App.4th 270, 282-283; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1264.)

"As the high court has explained, cross-examination is required in order 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' (*Davis v. Alaska* (1974) 415 U.S. 308, 318.) '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . .' (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.)" (*People v. Smith* (2007) 40 Cal.4th 483, 513.)

The defendant's right to "test the credibility, knowledge, and recollection of the witness . . . should be given wide latitude . . . . [Citations.]" (*Watson, supra*, 46 Cal.2d at p. 827.) "The trial court, of course, has a 'wide latitude' of discretion to restrict cross-examination and may impose reasonable limits on the introduction of such evidence. [Citation.] Thus, 'unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citations.]" (*People v. Smith, supra*, 40 Cal.4th at p. 513; see also *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680.)

Defendants have not shown that a significantly different impression of Traveon might have resulted from testimony that he told detectives that he had heard someone called Happy Jack had participated in the shooting. Russell points out that the prosecutor's purpose in asking Traveon whether he had heard that the shooting was gang related was to raise an inference that Traveon's conflicting testimony was the result of fear. He further contends that Traveon's willingness to name Happy Jack in his police interview would have shown that Traveon was not, in fact, afraid to name a suspect. As Traveon testified he was not afraid, naming Happy Jack did not contradict that testimony. Moreover, Traveon did not testify in direct examination that he knew or did not know who the shooter was, or that he told detectives who the shooter was; thus the identification of Happy Jack would not have contradicted his testimony.

Evans contends that once the prosecutor elicited testimony regarding *anything* Traveon told the police about the shooting, she opened the door to *everything* he told the police about the shooting. This contention, like Russell's, does not relate to Traveon's reliability or credibility, but appears to be based upon the rule that where part of a conversation has been admitted by one party, the opposing party may bring out the whole of the conversation. (See Evid. Code, § 356.) Evans does not expressly invoke that rule, which, in any event, has always been subject to the qualification that the court may exclude those portions of the conversation that are not relevant to the statement introduced. (*People v. McCoy* (1944) 25 Cal.2d 177, 187; see also *Watson, supra*, 46 Cal.2d at p. 827.) Thus, although prior inconsistent statements may be admitted to discredit a witness, "[t]he 'entire conversation' rule . . . does not permit reception of other portions of a conversation which are not explanatory of that which has been brought out by the adversary, and which are intrinsically inadmissible. [Citations.]" (*People v. Albert* (1960) 182 Cal.App.2d 729, 741.)

We agree with respondent that the question about Happy Jack called for hearsay and that its only apparent purpose was to introduce minimally probative evidence of third-party culpability. Evidence that a third person committed the crime is inadmissible unless it meets "minimum standards of relevance" and is capable of raising a reasonable

38

doubt as to defendant's guilt. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1017-1018.) Thus, evidence of collateral or insignificant matters that merely suggest third-party culpability is inadmissible for that purpose. (*People v. Hall* (1986) 41 Cal.3d 826, 832-834.) Further, the inability to present "weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights. [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1261, citing *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327.)

Evidence suggesting that some otherwise unidentified person called Happy Jack was a participant in the crimes did not meet any minimum standard of relevance, and was inadmissible, not only as hearsay, but as too weak and speculative to raise a reasonable doubt about defendants' guilt. As it was incapable of raising a reasonable doubt, we also conclude that any error in excluding it would have been harmless under the test of either *Chapman v. California* (1967) 386 U.S. 18, 24, or *Watson*, *supra*, 46 Cal.2d at page 836.

## IX. Rifle

Evans contends that the trial court abused its discretion by overruling his objection under Evidence Code section 352 and admitting evidence that a rifle was found in the trunk of the Nissan.

The trial court found that the evidence was relevant to the gang enhancement, and that the potential for prejudice was outweighed by the probative value of the rifle to show that defendants' gang was a violent gang that used weapons. Evans contends that the trial court erred because the rifle was not used in the shooting and there was insufficient evidence linking him to the rifle or the gang. He contends that the error was prejudicial because there was insufficient evidence identifying him as a participant in the crime.

The trial court's discretion under Evidence Code section 352 will not be disturbed unless it was exercised "'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*Rodrigues, supra*, 8 Cal.4th at pp. 1124-1125.) A trial court does not abuse its discretion merely because the facts "afford an opportunity for a difference of opinion. An appellate

tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.]" (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

Whatever the probative value of a rifle in the trunk, it was not unduly prejudicial in light of ample identification evidence and defendants' use of other guns: Evans's ownership of a holster and speed loader for a .44-caliber handgun supported a reasonable inference that Evans owned the .44-caliber handgun used in the shooting; and the DNA analysis provided evidence that both Evans and Russell handled that gun as well as the .357-caliber handgun found in the passenger area of the Nissan. Little in the way of damaging or inflammatory effect could be added by a rifle in the trunk. Thus, as no miscarriage of justice is shown and the trial court's reasoning was not patently absurd, defendants failed to demonstrate an abuse of discretion. The same facts demonstrate that there is no reasonable probability that the outcome would have been different if the jury had not heard about the rifle in the trunk. Any error in admitting the evidence would thus have been harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

## X. Equal protection and section 12022.53

Defendants contend that the sentence enhancement under section 12022.53, subdivisions (d) and (e)(1), violates their constitutional right to equal protection of the laws by treating aiders and abettors of shootings committed for the benefit of a criminal street gang differently from aiders and abettors of shootings committed in concert by criminal organizations or groups not defined as street gangs. When read together, subdivisions (d) and (e)(1) of section 12022.53 require the trial court to add a consecutive 25 years to life term to the sentence of a defendant convicted of murder or attempted murder for the benefit of a criminal street gang, when the jury finds that a principal in the offense personally and intentionally discharged a firearm, causing death or great bodily injury to the victim.

"Broadly stated, equal protection of the laws means 'that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.' [Citation.]" (*People v. Wutzke* (2002) 28 Cal.4th 923, 943.) In

40

making such a claim, the defendants bear the burden to show "'that the state has adopted a classification that affects two or more *similarly situated groups* in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199.) Once that burden is met, the statute is given "''some level of scrutiny to determine whether distinctions between the two groups justify the unequal treatment.' [Citation.]" (*Id*. at p. 1200.) The statute is subject to strict scrutiny when fundamental interests are involved, to determine whether it is necessary to achieve a compelling state interest. (*Ibid*., citing *Romer v. Evans* (1996) 517 U.S. 620, 635.) "Where . . . a statute involves neither a suspect class nor a fundamental right, it need only meet minimum equal protection standards, and survive 'rational basis review.' [Citation.]" (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).)

There is no fundamental interest in the specific term of imprisonment a criminal defendant might receive; thus, equal protection challenges based on sentencing disparities are subject to the rational basis test. (*Turnage*, *supra*, 55 Cal.4th at p. 74, citing *People v. Wilkinson* (2004) 33 Cal.4th 821, 838 (*Wilkinson*).) Under that test, similar equal protection challenges to section 12022.53 were rejected in *People v. Hernandez* (2005) 134 Cal.App.4th 474, 480-483 (*Hernandez*), and *People v. Gonzales* (2001) 87 Cal.App.4th 1, 12-13 (*Gonzales*).)**16**

Relying on *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), defendants contend that *Hernandez* and *Gonzales* were wrongly decided, as they applied the rational basis test, whereas strict scrutiny was required because sentencing involves a fundamental liberty interest. Defendants' reliance is misplaced, as *Olivas* was decided before *Wilkinson*, in which the California Supreme Court warned that *Olivas* is applicable only to periods of confinement given to juvenile defendants convicted in adult court, and its narrow holding should not be "interpreted to require application of the strict scrutiny

---

**16**    Both cases rejected the equal protection challenge without deciding whether the defendants had met their burden to establish that they were similarly situated to aiders and abettors of murders committed by criminal organizations other than criminal street gangs. (See *Hernandez*, at p. 481; *Gonzales*, at p. 13.) We do the same.

41

standard whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes . . . ." (*Wilkinson, supra*, 33 Cal.4th at p. 837; see also *People v. Ward* (2005) 36 Cal.4th 186, 218.)

We conclude that *Hernandez* and *Gonzales* properly applied the rational basis test, and we agree with the reasoning of those cases. The state has a legitimate interest in suppressing criminal street gangs and "'the serious threats posed to the citizens of California by gang members using firearms'"; this provides a rational basis for greater punishment for those who aid and abet gang related shootings that result in death or great bodily injury. (*Hernandez, supra*, 134 Cal.App.4th at pp. 481-482, fn. omitted.) Thus section 12022.53 "'is not prohibited by the equal protection clause from striking the evil where it is felt the most.'" (*Id*. at p. 482, fn. omitted; see also *Gonzales, supra*, 87 Cal.App.4th at pp. 12-13.)

## XI. Cumulative error

Defendants contend that the cumulative effect of all the errors heretofore discussed was to deny them a fair trial. Because "[w]e have either rejected on the merits defendant[s'] claims of error or have found any assumed errors to be nonprejudicial," we must reject defendants' claim of prejudicial cumulative effect. (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

### DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                             CHAVEZ


We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST


42